669 A.2d 896

COMMONWEALTH of Pennsylvania, Appellee,

v.

**William WHITE, Appellant.**

Supreme Court of Pennsylvania,
Western District.

Argued March 7, 1994.

Decided Dec. 29, 1995.

46

Robert E. Stewart, Pittsburgh, for Appellant.

Robert E. Colville, District Attorney, Claire C. Capristo, Deputy District Attorney, Kemal A. Mericli, Michael W. Streily, Assistant District Attorneys, for Appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

The sole issue raised in this case is whether the police may conduct a warrantless search of an automobile, absent exigent circumstances, after its occupants have been arrested and are outside the automobile in police custody. For the reasons that follow, we hold that such a search is illegal and that evidence seized as a result must be suppressed.

The facts of record are that in late 1989 Pittsburgh police received anonymous telephone calls identifying William White and Henry Bennett as drug dealers. The caller described the two men and gave their addresses and locations where they allegedly dealt drugs. Subsequently, police met with a confidential informer who confirmed the information given by the anonymous caller and added a description of Bennett's car and the method by which the two made drug deliveries.

In late January, 1990, police arranged a controlled purchase of cocaine using the confidential informer. One of the two officers who witnessed the purchase and the informer identified White as the person who sold cocaine to the informer. The material purchased from White tested positively as cocaine.

In February, 1990, the confidential informer told police that he had seen a large supply of cocaine in Bennett's house; that Bennett told him that he would be selling cocaine that weekend; and that the drugs were being moved back and forth between Bennett's and White's residences. He also told detectives that the dealers intended to make a sale of cocaine behind Abbott's Beer Distributor on Saturday, February 17, 1990.

Police arranged to have the area put under surveillance on February 17. The two detectives who had been working on the case met with others who would be assisting that day and briefed them. The essence of what the other police were told was that a blue car was expected to be involved in an illegal drug sale. Early on February 17, the two detectives who controlled the investigation drove by Bennett's house and witnessed Bennett, White and another man standing on the front porch.

Based on the totality of their information, the detectives secured search warrants for Bennett's residence, his vehicle, and his person as well as White's residence and person. They did not obtain a search warrant for White's vehicle. The detectives then returned to the stakeout area and communicated to other officers that they had secured search warrants.

Shortly thereafter, White drove his blue Ford into the area. An unidentified man got into White's car, and as this was happening, Bennett drove into the area and passed White's car several times before leaving the area. When Bennett was gone, police converged upon White's car.

Although police accounts of what happened during White's arrest differ somewhat, the essence is that six or eight police officers converged upon White's car and took both the passen-

ger and White into custody. According to one officer's account, the driver emerged at gunpoint; another officer, who was also present, said that the driver exited the car voluntarily after the officer identified himself and asked him to come out of the car.

Next, two officers partially entered the car from both open doors. The officer on the passenger side of the car first noticed and communicated to his colleague that a marijuana cigarette was present on the console between the seats; moments after that the officer on the driver's side retrieved a brown paper bag from between the two front seats, which he took outside the car to open. Upon discovering that the bag contained cocaine, the officer announced to the others that he had "the dope," and the occupants of the car were handcuffed.

The court of common pleas, sitting as a suppression court, suppressed the evidence on the grounds that White was not arrested until after the warrantless search uncovered a marijuana cigarette and the cocaine. The court further observed that there were no exigent circumstances justifying a warrantless search of the car and that police had time to secure a search warrant for the vehicle because they received information about the February 17 transaction between thirty-six and forty-eight hours before the search.

Superior Court reversed, holding that a search warrant for White's automobile was not required because police had probable cause to search the vehicle and the search was properly conducted pursuant to the "automobile exception" to the warrant requirement. The rationale for this exception is said to be that it is impracticable to obtain warrants for vehicles in transit because of their highly mobile nature, and that absent the search it is possible that the vehicle will be moved and contraband will disappear. Superior Court acknowledged that a warrantless search of a vehicle is permissible only when probable cause arises in an unforeseen way, but concluded that probable cause was unforeseen in this case because it was unknown what vehicle would be used.

Superior Court also held that in any event, the search occurred "incident to a lawful arrest," and was, therefore, justified.

We granted allowance of appeal in order to address the question of when police must secure search warrants in order to conduct vehicle searches.

Before addressing these substantive matters, however, it is necessary to address the Commonwealth's claim that White has waived his claim that the search of his automobile was illegal under Article I, Section 8 of the Pennsylvania Constitution [1] because he did not set forth his state constitutional claims in the manner required by *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). This claim is meritless. White clearly raises a claim under the Pennsylvania Constitution, cites cases in support of his claim, and relates the cases to the claim. That is sufficient. In *Edmunds*, in dicta, this court clearly stressed the importance of briefing and analyzing certain factors in order to aid the courts in reviewing state constitutional issues.[2] While not mandating the analysis, we reaffirm its importance and encourage its use. In other words, *Edmunds* expresses the idea that it may be helpful to address the concerns listed therein, not that these concerns must be addressed in order for a claim asserted under the Pennsylvania Constitution to be cognizable.

1. Art. 1, § 8 provides:

 The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

2. As stated in *Edmunds:*

 as a general rule it is important that litigants brief and analyze at least the following four factors:
 1) text of the Pennsylvania constitutional provision;
 2) history of the provision, including Pennsylvania case-law;
 3) related case-law from other states;
 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.
 526 Pa. at 390, 586 A.2d at 895.

Having concluded that White has raised cognizable claims under the Pennsylvania Constitution, it remains to address whether the search was justified because it was conducted pursuant to the "automobile exception"; whether the search was justified because the probable cause on which it was based arose in an unforeseen manner; whether the search was permissible because it was incident to an arrest; and whether the search is to be excused because an inventory search would have disclosed the same evidence.

With respect to the claim that the search of the vehicle was permissible under the "automobile exception," the Commonwealth and Superior Court are in error. The so-called "automobile exception" to the requirement for a search warrant is perhaps best articulated in *Chambers v. Maroney:*

> In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. *Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search.* Carroll, supra, holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible.

399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970) (Emphasis added).

██ In sum, the general rule is that a search warrant is required before police may conduct any search. As an exception to this rule, police may search a vehicle without a warrant where: (1) there is probable cause to believe that an automobile contains evidence of criminal activity; (2) unless the car is searched or impounded, the occupants of the automobile are likely to drive away and contents of the automobile may never

again be located by police; and (3) police have obtained this information in such a way that they could not have secured a warrant for the search, i.e., *there are exigent circumstances.*

This court addressed the "automobile exception" in *Commonwealth v. Ionata,* 518 Pa. 472, 544 A.2d 917 (1988), where police applied for and received a search warrant for the person and the apartment of Ionata based on information that he was involved in the drug business and that drugs were hidden in the hood compartment of his car. In *Ionata,* as in this case, police did not request a warrant for the search of the suspect's automobile. Nonetheless, when Ionata drove up to his apartment, police removed him from the car and searched the car, finding illegal narcotics and drug paraphernalia. At that point, Ionata was placed under arrest. The Commonwealth argued that because there was probable cause to have obtained a search warrant for the automobile, the search was permissible even though no warrant had been obtained. A three-member plurality of this court disagreed:

> While certain exceptions to constitutional requirements of obtaining warrants have been recognized in the realm of vehicle searches, it cannot be said that searches of motor vehicles are, *per se,* exempt from warrant requirements. In *Commonwealth v. Milyak,* 508 Pa. at [2] 7–8, 493 A.2d [1346] at 1349 (1985), this Court stated,
>
> > While searches and seizures conducted outside the judicial process, without prior approval by a magistrate, are generally unreasonable under the Fourth Amendment . . . there is an established departure from the warrant requirement for *certain* automobile searches based on the inherent mobility of vehicles, with the consequent *practical problems in obtaining a warrant* prior to infringing a legitimate expectation of privacy. . . .

(Emphasis added). See also *Commonwealth v. Cockfield,* 431 Pa. 639, 644, 246 A.2d 381, 384 (1968) ("[A]n automobile is not *per se* unprotected by the warrant procedure of the Fourth Amendment. Although it *sometimes* may be reasonable to search a movable vehicle without a warrant, the movability of the area to be searched is not alone a suffi-

ciently 'exigent circumstance' to justify a warrantless search."); Pennsylvania Constitution, Art. I, § 8....

518 Pa. at 476–77, 544 A.2d at 919 (Opinion in Support of Affirmance).

█ The present case, with respect to the "automobile exception," is analytically identical to *Ionata*. In both cases the police had ample advance information concerning the fact that a search of an automobile would likely be involved in apprehending the suspect. When that is true, a warrant is required before the automobile may be searched. As the United States Supreme Court stated in *Chambers v. Maroney:*

> Neither Carroll, supra, nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without extra protection for privacy that a warrant affords. *But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable....*

399 U.S. at 51, 90 S.Ct. at 1980–81, 26 L.Ed.2d at 428. (Emphasis added.) In other words, although the Fourth Amendment generally requires probable cause to be determined and a warrant to be issued by a magistrate before a search may be conducted, unforeseen circumstances involving the search of an automobile coupled with the presence of probable cause, may excuse the requirement for a search warrant. In *Ionata* and in this case, there were no unforeseen circumstances. Police knew in advance what automobiles might be involved and could have requested warrants for the search of the automobiles, just as they did for persons and dwellings.[3] Superior Court was in error, therefore in determining that the search was permissible under the "automobile exception" and that exigent circumstances existed to justify the search.

3. In this case, the mere fact that police did not know which car would be used to conduct the drug transaction is not sufficient to qualify as an unforeseen circumstance. Police could have drafted their request for a warrant in terms that were "as particular as is reasonably possible," *Commonwealth v. Grossman*, 521 Pa. 290, 296, 555 A.2d 896, 899 (1989), in order to secure the warrant.

54

■ Next, Superior Court determined that in any event, the search was permissible because it occurred incident to an arrest. Although White contends that he was not under arrest at the time the search was conducted and that he was put under arrest only after the warrantless search of his car was completed, this claim is meritless. In *Commonwealth v. Rodriquez*, we reiterated the test for determining whether an arrest has occurred:

"We have defined an arrest as any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest...."

532 Pa. 62, 74, 614 A.2d 1378, 1384 (1992), quoting *Commonwealth v. Duncan*, 514 Pa. 395, 400, 525 A.2d 1177, 1179 (1987). Under either officer's account of the arrest, it is fair to say that White was not free to leave and that he was subject to the control of the officers who removed him from the car. Had he attempted leave, it seems likely that he would have been looking down the barrels of several guns. He was, therefore, under arrest.

That White was under arrest at the time of the search does not, however, dispose of the matter of the legality of the warrantless search. Superior Court's view that a warrantless search of an automobile is permissible if it is incident to arrest is in accord with the United States Supreme Court's view in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In *Belton*, a police officer stopped a car for a traffic violation and smelled marijuana. He also saw on the floor of the vehicle an envelope marked "Supergold," a term he associated with marijuana. The officer removed the driver and three passengers from the car and placed them under arrest. He searched each of the occupants of the car and then searched the car, where he found a black leather jacket in the back seat. He unzipped one of the pockets and discovered cocaine. The United States Supreme Court held that the search of the vehicle was lawful even though the jacket was not accessible to any of the occupants of the car, who could not, therefore, retrieve any weapons from the jacket or de-

stroy any contraband which might be contained therein. The holding in *Belton* is as follows:

[W]e hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

*Id.* at 460, 101 S.Ct. at 2864, 69 L.Ed.2d at 775.

One year before *Belton* was decided, this court had occasion to address the same question in *Commonwealth v. Timko*, 491 Pa. 32, 417 A.2d 620 (1980). In *Timko*, police arrested a driver who had been operating his vehicle erratically and who, after stopping, would not open the doors or windows of the vehicle. As police attempted to gain entrance to the van, Timko reached for a zipped bag and then attempted to drive away. At that point, police broke into the van and dragged Timko from the vehicle. After Timko was searched and handcuffed, police searched the bag into which he had attempted to reach, finding two packages of marijuana and a loaded revolver. We held that the fruits of the search must be suppressed. In response to the Commonwealth's claim that there is an "automobile exception" based on the inherent mobility of automobiles, practical problems in obtaining warrants and the diminished expectation of privacy, we stated:

In the case of luggage, no such considerations operate to diminish the citizen's expectation of privacy. A piece of luggage is not mobile once it is taken into police custody.... Thus, a zippered valise, analogous to personal luggage, may not be searched without a warrant simply because it has been seized from an automobile.

491 Pa. at 38–39, 417 A.2d at 623.

Thus, the *Timko* court limited the warrantless search of an automobile incident to an arrest to areas and clothing immediately accessible to the person arrested. Further, the court made it clear that the purpose of this search is to prevent the arrestee from securing weapons or destroying contraband. *Id.*[4]

4. The *Timko* court writes:

It is axiomatic that the Supreme Court of Pennsylvania may provide more protection for the citizens of Pennsylvania under the Pennsylvania Constitution than the federal courts provide under the United States Constitution, and it is our view that the rule of *Timko* is as valid today as it was fifteen years ago when *Timko* was decided. In fact, the thrust of *Timko* is even more compelling today than it was in 1980 because this court has increasingly emphasized the privacy interests inherent in Article I, Section 8 of the Pennsylvania Constitution. See *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). By contrast, the United States Supreme Court has deemphasized the privacy interests inherent in the Fourth Amendment. As the Court stated in *Belton:*

> [T]he justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have.

453 U.S. 454, 461, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981). As we stated in *Commonwealth v. Mason*, 535 Pa. 560, n. 3, 637 A.2d 251, n. 3 (1993), this court, when considering the relative importance of privacy as against securing criminal convictions, has struck a different balance than has the United States Supreme Court, and under the Pennsylvania balance, an individual's privacy interests are given greater deference than under federal law.

 We disagree, therefore, with Superior Court's determination that White's vehicle was permissibly searched because

A police officer may conduct a search of an arrestee's person and the area within an arrestee's immediate control as a matter of course because of the ever-present risk in an arrest situation that an arrestee may seek to use a weapon or to conceal or destroy evidence.... However,

> "[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest."

*United States v. Chadwick*, supra, 433 U.S. [1] at 15, 97 S.Ct. [2476] at 2485 (1977).

491 Pa. at 37, 417 A.2d at 622–23.

White was under arrest. Merely arresting someone does not give police carte blanche to search *any* property belonging to the arrestee. Certainly, a police officer may `search the arrestee's person and the area in which the person is detained in order to prevent the arrestee from obtaining weapons or destroying evidence, but otherwise, absent an exigency,[5] the arrestee's privacy interests remain intact as against a warrantless search. In short, there is no justifiable search incident to arrest under the Pennsylvania Constitution save for the search of the person and the immediate area which the person occupies during his custody, as stated above.[6]

■ Finally, it remains to consider the Commonwealth's claim that the warrantless search should be excused because an inventory search would have disclosed the same evidence. In *Timko* we summarily dismissed a similar argument by reference to *Commonwealth v. Brandt,* 244 Pa.Super. 154, 366 A.2d 1238 (1976), which held that an inventory search is permissible when the vehicle is lawfully in the custody of police and when police are able to show that the search was in fact a search conducted for the purposes of protection of the owner's property while it remains in police custody; protection of the police against claims of lost or stolen property; and protection of the police against danger. If the search was conducted as part of a criminal investigation, it is not an

---

**5.** We do not propose to invalidate warrantless searches of vehicles where the police must search in order to avoid danger to themselves or others, as might occur in the case where police had reason to believe that explosives were present in the vehicle. Emergencies such as this, however, are not part of this case.

**6.** The record indicates that after White was removed from the car, he was patted down for weapons and then moved a short distance from his car under close police guard. He was not free to return to his vehicle, as a police officer testified:

Q: Did you have any concern at that time that Mr. White perhaps would run back to his vehicle?
A: When he was with me?
Q: When he was with you ten feet away by your car.
A: No. I believe I was standing in his path back to his vehicle.

Thus, whatever was contained in the vehicle was not accessible to White, and there is nothing of record to indicate that there were any exigent reasons, such as danger to police, which would justify a warrantless search of the car.

inventory search. There is no doubt that the warrantless search in this case was conducted as part of a criminal investigation, and it is not, therefore, permissible as an inventory search.

The order of Superior Court is reversed.

PAPADAKOS, J., did not participate in the decision of this case.

MONTEMURO, J., files a concurring opinion.

CASTILLE, J., files a dissenting opinion.

MONTEMURO, J., participates by designation as a senior judge as provided by Rule of Judicial Administration 701(f).

MONTEMURO, Justice, concurring.

I respectfully concur in the result reached by the Majority.

Four years ago, in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), this Court asserted the right to provide broader protections to our citizens under the Pennsylvania Constitution than provided by the United States Constitution. Our decision in *Edmunds* provides a clear analytical framework for discussion of when additional protections under our own state constitution are warranted. This framework requires the courts of our Commonwealth to analyze the following four factors:

1) the text of the Pennsylvania constitutional provision

2) the history of the provision, including Pennsylvania caselaw

3) related case-law from other states;

4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

*Id.* at 390, 596 A.2d at 895.

We further held in *Edmunds* that it was "essential" that our courts "undertake an independent analysis under the Pennsylvania Constitution." *Id.* at 391, 567 A.2d at 895. We also

recognized that it was "important" for litigants to analyze and brief the four prongs of this analysis when implicating a provision of the Pennsylvania Constitution. *Id.* at 390, 567 A.2d at 895.

In the instant case, the Majority has failed to employ the *Edmunds* analysis in deciding that Article I, Section 8 of the Pennsylvania Constitution provides more protections than the Fourth Amendment of the United States Constitution as interpreted in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). The Majority has also held that litigants asserting additional rights under the Pennsylvania Constitution do not have to argue the *Edmunds* analysis before this Court in any meaningful way. Combined, I believe that these two actions have the effect of weakening our decision in *Edmunds.* The Majority has sent a message to the lower courts and to litigants that the *Edmunds* analysis does not have to be argued by the parties nor used by our courts in deciding when additional rights are extended under the Pennsylvania Constitution. I disagree. Instead, I would reaffirm the *Edmunds* analysis as vital in deciding when additional rights are required under the Pennsylvania Constitution by requiring litigants to argue it and by requiring courts, including this Court, to employ it in their decisions.

Within that framework, I believe that it is essential for this Court to engraft a standard on to the *Edmunds* analysis. This case demonstrates that the *Edmunds* analysis is a rather loose analytical tool which, as currently interpreted, fails to provide sufficient guidance to litigants or to the lower courts. Thus, in addition to making the four prongs of *Edmunds* mandatory, I believe that we need to provide a clear constitutional standard for evaluating these prongs. In my opinion, the standard implicitly created by *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980) and *Edmunds* encourages us to deviate from the reasoning of the United States Supreme Court when there are important and substantial reasons for doing so. My analysis of our *Edmunds* jurisprudence is that we have not departed from the federal interpretation unless

there was an important reason to do so. *Compare United Artist Theater Circuit, Inc. v. City of Philadelphia,* 535 Pa. 370, 635 A.2d 612 (1993) (Pennsylvania takings clause does not provide more protections than federal takings clause) *with Blum v. Merrell Dow Pharmaceuticals,* 534 Pa. 97, 626 A.2d 537 (1993) (rejecting federal case-law and holding that Pennsylvania Constitution requires 12 member jury to parties who request them). In short, I would make explicit this implicit standard so as to provide a maximum amount of guidance to our lower courts and to litigants.

In summation, I believe that we must re-affirm the *Edmunds* analysis and strengthen it. I would do this by (1) making it mandatory for litigants to brief the four prongs of *Edmunds;* (2) making it mandatory for the courts of our Commonwealth to engage in the *Edmunds* analysis; and (3) adopting an "important and substantial reason" standard for departing from decisions of the United States Supreme Court. Only with these reforms, I believe, will litigants and the lower courts have clear guidance as to when our Constitution provides additional protections.

Analyzed under the four prongs of *Edmunds,* I believe that this case presents important reasons for departing from the United States Supreme ·Court's holding in *Belton* and providing additional protections under our Constitution. The first prong we are required to analyze under *Edmunds* is the text of the Pennsylvania Constitutional provision. In *Edmunds,* we noted that Article I, Section 8 of the Pennsylvania Constitution is "similar in language" to the Fourth Amendment of the United States Constitution. *Edmunds,* 526 Pa. at 391, 586 A.2d at 887. However, we concluded that we "are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical." *Id.* at 391, 586 A.2d at 895–96. Therefore, the similarity between the text of Article I, Section 8 of the Pennsylvania Constitution and the text of the Fourth Amendment of the United States Constitution does not require us to adopt *Belton* as the rule in this Commonwealth.

Next, *Edmunds* requires us to examine the history of the provision along with the relevant case-law. In *Edmunds,* we concluded that Article I, Section 8 "is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." *Id.* at 394, 586 A.2d at 897. However, I cannot accept the Majority's blanket assertion that Pennsylvania "has struck a different balance than has the United States Supreme Court, and under that balance, an individual's privacy interests are given greater deference than under federal law." Majority Opinion at 56. The Majority would apparently extend additional privacy protections under Article I, Section 8 to all who assert them. Instead, I believe *Edmunds* commands that we must carefully scrutinize the asserted privacy interest to determine whether it is protected under Article I, Section 8 of the Pennsylvania Constitution.

In the instant case, Appellant is asserting a privacy interest in his automobile. Of course, our cases have long recognized a diminished privacy interest in an automobile based on federal case-law. *See, e.g., Commonwealth v. Milyak,* 508 Pa. 2, 7, 493 A.2d 1346, 1349 (1985); *Commonwealth v. Timko,* 491 Pa. 32, 38, 417 A.2d 620, 623 (1980); *Commonwealth v. Mangini,* 478 Pa. 147, 156, 386 A.2d 482, 487 (1978); *Commonwealth v. Swanger,* 453 Pa. 107, 110, 307 A.2d 875, 877 (1973). However, that federal privacy interest was substantially curtailed by the United States Supreme Court in *Belton.* My research indicates that we have also recognized a constitutionally protected reasonable expectation of privacy in an automobile under Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Holzer,* 480 Pa. 93, 101 & n. 4, 389 A.2d 101, 105–6 & n. 4 (1978); *Commonwealth v. Baker,* 518 Pa. 145, 148, 541 A.2d 1381, 1383 (1988), *overruled on other grounds by Commonwealth v. Rosario,* 538 Pa. 400, 648 A.2d 1172 (1994); *Commonwealth v. Morris,* 537 Pa. 417, 422 & n. 3, 644 A.2d 721, 724 & n. 3 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994). In *Holzer* we held that "constitutional protections are applicable to a person's car" under Article I, Section 8 of the Pennsylvania Constitution.

*Holzer*, 480 Pa. at 103, 389 A.2d at 106. In *Baker*, we held that "[i]t is well established that automobiles are not *per se* unprotected by the warrant requirements of ... Article I, Section 8 of the Pennsylvania Constitution." *Baker*, 518 Pa. at 148, 541 A.2d at 1383.

Thus, the history of Article I, Section 8 and case-law interpreting it reveal a history of according a limited expectation of privacy in an automobile independently under the Pennsylvania Constitution. Therefore, the question before us today is not whether we wish to extend additional privacy protections to the Appellant but whether we wish to follow the United States Supreme Court and sharply curtail a privacy interest long recognized by this Court. In my opinion, this prong weighs against automatically adopting *Belton*. Instead, I believe we must carefully consider the merits of severely diminishing a privacy right independently recognized under our own constitution.

The third prong of the *Edmunds* analysis requires that we examine related case-law from our sister states. A review of this case-law reveals that the vast majority of states have adopted the reasoning of the United States Supreme Court in *Belton. See, e.g., Baxter v. State,* 274 Ark. 539, 626 S.W.2d 935, 937 *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2930, 73 L.Ed.2d 1331 (1982); *People v. Henry,* 631 P.2d 1122, 1128 (Colo.1981); *State v. Waller,* 223 Conn. 283, 612 A.2d 1189, 1193 (1992); *Traylor v. State,* 458 A.2d 1170, 1173 (Del.1983); *State v. Calegar,* 104 Idaho 526, 530, 661 P.2d 311, 315 (1983); *People v. Hoskins,* 101 Ill.2d 209, 78 Ill.Dec. 107, 111, 461 N.E.2d 941, 945, *cert. denied,* 469 U.S. 840, 105 S.Ct. 142, 83 L.Ed.2d 81 (1984); *Jackson v. State,* 597 N.E.2d 950, 957 (Ind.1992); *cert. denied,* 507 U.S. 976, 113 S.Ct. 1424, 122 L.Ed.2d 793 (1993); *State v. Sanders,* 312 N.W.2d 534, 539 (Iowa 1981); *State v. White,* 230 Kan. 679, 640 P.2d 1231, 1232 (1982); *Brown v. Commonwealth,* 890 S.W.2d 286, 290 (Ky.1994); *State v. Lamare,* 463 A.2d 279, 280 (Me.1983); *Ricks v. State,* 322 Md. 183, 586 A.2d 740, 746 (1991); *People v. Bullock,* 440 Mich. 15, 485 N.W.2d 866, 869 (1992); *State v. Liljedahl,* 327 N.W.2d 27, 30 (Minn.1982); *Horton v. State,* 408 So.2d 1197, 1198–99

(Miss.1982); *State v. Harvey,* 648 S.W.2d 87, 88 (Mo.1983); *State v. Roth,* 213 Neb. 900, 331 N.W.2d 819, 821 (1983); *State v. Cooper,* 304 N.C. 701, 286 S.E.2d 102, 104 (1982); *State v. Rice,* 327 N.W.2d 128, 131 (S.D.1982); *State v. Cabage,* 649 S.W.2d 589, 591–92 (Tenn.1983); *State ex rel. K.K.C.,* 636 P.2d 1044, 1046 (Utah 1981); *State v. Phillips,* 140 Vt. 210, 436 A.2d 746, 749 (1981); *State v. Smith,* 119 Wash.2d 675, 835 P.2d 1025 (1992); *State v. Boswell,* 170 W.Va. 433, 441–42, 294 S.E.2d 287, 295 (1982); *State v. Fry,* 131 Wis.2d 153, 388 N.W.2d 565, 571–72 (1986), *cert. denied,* 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed.2d 586 (1986); *Lopez v. State,* 643 P.2d 682, 685 (Wyo.1982).

However, a close examination of these cases shows that few of our sister states have addressed the applicability of *Belton* in light of their own state constitutions. Only a handful of these states have engaged in an independent state constitutional analysis. *See, e.g., Waller,* 612 A.2d at 1193; *Hoskins,* 78 Ill.Dec. at 111, 461 N.E.2d at 945; *Sanders,* 312 N.W.2d at 539; *State v. Hensel,* 417 N.W.2d at 849, 853 (1988); *Rice,* 327 N.W.2d at 131; *Fry,* 388 N.W.2d at 574.

For example, in *Hoskins,* the Supreme Court of Illinois adopted *Belton* after rejecting the assertion that its own state constitution provided more protections than the United States Constitution:

Any suggestion that it was intended that section 6 of the bill of rights in our own constitution was to be interpreted differently from the Supreme Court's interpretations of the search provisions of the fourth amendment cannot be supported. The constitutional debates do not indicate any wish or intent to provide protections against unreasonable searches and seizures broader than those existing under decisional interpretations of the United States Constitution.

*Hoskins,* 78 Ill.Dec. at 111, 461 N.E.2d at 945.

In *Sanders,* the Supreme Court of Iowa deferred to the balance struck by the United States Supreme Court and refused to adopt a stricter standard under its state constitution than the one set forth in *Belton:*

"Defendant's objections to the search and seizure are based on both federal and state constitutional protections. We can, if we choose, impose stricter standards in applying our own constitutional provisions than the United States Supreme Court did in Belton. However, we believe that Belton strikes a reasonably fair balance between the rights of the individual and those of society. We adopt it now as our rule."

*Sanders,* 312 N.W.2d at 539.

In *Fry,* the Supreme Court of Wisconsin voiced concerns for national uniformity of Fourth Amendment law in not extending additional protections under its own state constitution:

"By adopting the Belton rule, Wisconsin police officers can follow the fourth amendment's mandates without worrying about whether some different restrictions might be imposed on them under the Wisconsin Constitution. Uniformity of interpretation, as long as consistent with the protections of art. 1, sec. 11 of the Wisconsin Constitution, reduces to a minimum the confusion and uncertainty under which police must operate. Moreover, conforming Wisconsin's search and seizure law to that developed by the Supreme Court under the fourth amendment is not only consistent with the text of Wisconsin's search and seizure provision, its constitutional history and its judicial history, but is also in accord with sound public policy."

*Fry,* 388 N.W.2d at 575.

In contrast, several of our sister states have refused to follow *Belton. See, e.g., State v. Hernandez,* 410 So.2d 1381, 1385 (La.1982); *Commonwealth v. Toole,* 389 Mass. 159, 448 N.E.2d 1264, 1266 (1983); *State v. Greenwald,* 109 Nev. 808, 858 P.2d 36, 37 (1993); *New Jersey v. Pierce,* 136 N.J. 184, 642 A.2d 947, 963 (1994); *People v. Belton,* 55 N.Y.2d 49, 447 N.Y.S.2d 873, 874, 432 N.E.2d 745, 746 (1982); *State v. Brown,* 63 Ohio St.3d 349, 588 N.E.2d 113, 115 (1992), *cert. denied,* 506 U.S. 862, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992).

For example, in *Pierce,* the Supreme Court of New Jersey refused to apply *Belton* to a case involving an arrest after a

routine traffic stop. The court relied exclusively on state constitutional grounds holding that "under article I, paragraph 7 of the New Jersey Constitution the rule of Belton shall not apply to warrantless arrests for motor vehicle offenses." *Pierce*, 642 A.2d at 959. The Supreme Court of New Jersey noted that motorists arrested for traffic offenses are usually removed from the vehicle and secured. Thus, the court reasoned:

> When an arrestee, as was the case with [the defendant], has been handcuffed and placed in the patrol car, and the passengers are removed from the vehicle and frisked, the officer's justification for searching the vehicle and the passenger's clothing is minimal. Thus, in the context of arrests for motor-vehicle violations, the bright-line Belton holding extends the [United States v.] Chimel[, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ] rule beyond the logical limits of its principle.

*Id.* at 960.

> The court concluded:

> We acknowledge the virtue of simple, straightforward rules to guide police officers in applying Fourth Amendment doctrine. Nevertheless, we are convinced that automatic application of the Belton bright-line rule to authorize vehicular searches incident to all traffic arrests poses too great a threat to rights guaranteed to New Jersey's citizens by their state constitution, and that threat to fundamental rights outweighs any incidental benefit that might accrue to law enforcement because of the simplicity and predictability of the Belton Rule.

*Id.* at 963.

Similarly, the Supreme Court of Ohio in *Brown* refused to apply the *Belton* bright line rule. The court opined: "We do not believe that the certainty generated by a bright-line test justifies a rule that automatically allows police officers to search every nook and cranny of an automobile just because the driver is arrested for a traffic violation." *Brown*, 588 N.E.2d at 115. Accordingly, the court held that the warrant-

less search of the defendant's automobile violated the Ohio Constitution. *Id.*

My review of these decisions of our sister states reveals that they are inconclusive on the question of whether Pennsylvania should adopt the *Belton* rule. Few of these cases present any detailed analysis of state constitutional concerns in deciding to follow or reject the *Belton* rule. The only case which engages in any meaningful analysis under its state constitution is *Pierce* which I find well reasoned in its criticism of the *Belton* bright-line rule.

The fourth prong of the *Edmunds* analysis requires us to examine public policy considerations. *Belton* was a case essentially decided on policy grounds. In *Belton,* the United States Supreme Court lamented the fact that "no straightforward rule has emerged from the litigated cases respecting the question involved here—the question of the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants." *Belton,* 453 U.S. at 459, 101 S.Ct. at 2863. The Court stated the proposition that "[w]hen a person cannot know how a court will apply a settled principle to a recurrent situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." *Id.* at 459–60, 101 S.Ct. at 2864. The Court then concluded that courts had found no workable definition of the "area within the immediate control of the arrestee" test formulated in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Thus, the United States Supreme Court established a "bright-line" rule holding "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Belton,* 453 U.S. at 460, 101 S.Ct. at 2864. The Court explained that "the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *Id.* at 461, 101 S.Ct. at 2864.

The *Belton* bright-line rule has been widely criticized. *See, e.g.,* Catherine Hancock, *State Court Activism and Searches Incident to Arrest,* 68 Va.L.Rev. 1085, 1130–31 (1982) (*Belton* rule dramatically reduces the level of Fourth Amendment protection afforded to motorists); David S. Rudstein, *The Search of an Automobile Incident to an Arrest: An Analysis of New York v. Belton,* 67 Marq.L.Rev. 205, 261 (1984) (urging return to *Chimel* rule) David M. Silk, *When Bright Lines Break Down: Limiting New York v. Belton,* 136 U.Pa.L.Rev. 281, 313 (1987) (urging that *Belton* be applied narrowly). One such commentator has stated that the *Belton* rule "does a disservice to the development of sound Fourth Amendment doctrine." Wayne R. Lefavre, *The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith",* 43 U.Pitt.L.Rev. 307, 325 (1982). Another has specifically criticized *Belton* for allowing searches once the occupant has been removed from the vehicle and arrested:

> If any bright line rule had been necessary to resolve the issue in Belton, it would have been the opposite of the rule that the court announced.... [O]ccupants almost invariably are removed before an automobile is searched; and once they have been removed, there is no longer much chance that they can secure weapons from the automobile or destroy evidence there.

Albert W. Alschuler, *Bright Line Fever and the Fourth Amendment,* 45 U.Pitt.L.Rev. 227, 274 (1984).

I agree that the *Belton* rule is seriously flawed and has no place in Pennsylvania jurisprudence. It has long been the rule in this Commonwealth that the police may search the passenger compartment of a car incident to an arrest only to protect their safety or to prevent the occupants from destroying contraband. *Timko,* 491 Pa. at 37, 417 A.2d at 622. In contrast, the *Belton* rule allows the police to search the passenger compartment and any containers contained therein even where no such exigency exists. The instant case demonstrates this point. Here, the defendant was removed from the car and arrested. At this point, the safety of the officers was no longer in jeopardy, and the defendant was unable to

destroy any evidence contained in the passenger compartment. Had the officers wanted to conduct an evidentiary search of the car, they could have secured the vehicle and obtained a proper search warrant. In my opinion, *Belton* carves too wide an exception to the warrant requirement where none is justified. We are asked today to follow *Belton* and dispense with the privacy interest in an automobile long recognized in our state constitution for the sake of a bright line rule. I am not convinced that our previous rule found in *Timko* and based upon *Chimel* created such practical law enforcement problems in this Commonwealth as to mandate that we dramatically curtail the privacy rights of motorists for the sake of a bright-line rule. In short, I do not believe that the reasoning of the United States Supreme Court's opinion in *Belton* carries the day. In my opinion, the widely criticized reasoning of *Belton*, the long-recognized privacy interest in an automobile under the Pennsylvania Constitution, and the lack of any evidence of insurmountable law enforcement problems in enforcing the current rule in this Commonwealth convince me that there are important and substantial reasons for departing from federal Fourth Amendment jurisprudence in this case. Like several of our sister states, I would not follow the *Belton* bright line rule; instead I would maintain the rule set forth in *Chimel.*

CASTILLE, Justice, dissenting.

The majority holds that even though the police in this matter had probable cause to believe that illegal drugs were located in appellant's car, and even though they saw a marijuana cigarette sitting on the console of appellant's automobile at the time they stopped his vehicle and lawfully removed him from the car pursuant to a valid warrant for appellant's person, and even though police found an eighth of an ounce of cocaine on appellant's person when they removed him from the car and lawfully searched him, the cocaine found in his vehicle nevertheless must be suppressed because police *could have* obtained a warrant for the automobile before entering

and searching it. Because I believe this holding leads to an absurd result, I must respectfully dissent.

Both the United States Supreme Court and this Court have recognized that the remedy of suppression of evidence seized is not a constitutional requirement. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3411–12, 82 L.Ed.2d 677 (1984). As remarked by Mr. Justice Larsen in *Commonwealth v. Corley*, 507 Pa. 540, 552, 491 A.2d 829, 835 (1985) (Larsen J., concurring): "Both the United States Supreme Court and this Court have made it clear that the exclusionary rule will not be extended to areas where its application would not tend to achieve its primary purpose of deterring unlawful misconduct." This Court has stated that:

A rule of exclusion is properly employed where the objection goes to the reliability of the challenged evidence ... or reflects intolerable government conduct which is widespread and cannot otherwise be controlled.

*Commonwealth v. Musi*, 486 Pa. 102, 115, 404 A.2d 378, 384 (1979) (citations omitted). In the present case, there was no police misconduct that would warrant suppression.

It is not disputed that police inadvertently failed to secure a warrant for appellant's vehicle at the time they secured the warrant for his person. While police are normally required to obtain warrants for searches where time allows them to do so, I believe that under these circumstances the suppression of the illegal contraband unnecessarily penalized *inadvertent* conduct by the police and does nothing to deter a perceived misconduct by the police. In short, it prioritizes form over substances and raises technicality to a high art.

Here, upon removing appellant from the vehicle, police saw drugs in the car *and* found drugs on appellant's person. These observations and discoveries of illegal contraband provided independent probable cause for the officers to suspect that additional contraband was in the car and which would allow police to lawfully search appellant's car. *See Common-*

*wealth v. Rosenfelt,* 443 Pa.Super. 616, 627–28, 662 A.2d 1131, 1136 (1995) (probable cause to search entire interior and trunk of vehicle where parole officer stopped parolee for parole violation and observed drug paraphernalia in plain view); *Commonwealth v. Evans,* 443 Pa.Super. 351, 367, 661 A.2d 881, 889 (1995) (probable cause to search where officer observed brick of marijuana in plain view during valid traffic stop); *Commonwealth v. Grimes,* 436 Pa.Super. 535, 543, 648 A.2d 538, 542 (1994), *alloc. denied,* 543 Pa. 702, 670 A.2d 642 (1995) (probable cause to search where police officer observed drugs and drug paraphernalia in plain view during valid DUI stop); *Commonwealth v. Hoffman,* 403 Pa.Super. 530, 544, 589 A.2d 737, 744 (1991), *alloc. denied,* 530 Pa. 652, 608 A.2d 28 (1992) (where police officers executing search warrant for residence observed drug paraphernalia in plain view in automobile, probable cause existed to search the car and evidence seized was admissible at trial). Accordingly, I believe that the eight ounces of cocaine found in the car should be allowed in a trial against appellant on drug and drug-related charges. *See Commonwealth v. Ionata,* 518 Pa. 472, 544 A.2d 917 (1988) (McDermott, J., opinion in support of reversal) (where police inadvertently failed to obtain warrant for automobile but did obtain warrants for appellant's person and home, and police in their zeal searched automobile for which they had probable cause to search prior to search of car, glassine packets, scale, fifteen hypodermic syringes and bags of methamphetamine should be admissible); *Commonwealth v. Milyak,* 508 Pa. 2, 493 A.2d 1346 (1985) (even though police had over two hours before search to obtain a warrant, warrantless search of a car was permitted where independent probable cause existed to believe that vehicle had been used in furtherance of a felony, or that evidence of a crime was concealed within.)

I further believe that the automobile exception to the warrant requirements of this Commonwealth should be a *per se* rule regardless of how much time police may have to obtain a warrant. This Court has previously adopted bright line rules where "experience proved it to be difficult for law enforcement

officials to administer" more flexible rules based on the totality of the circumstances. *Commonwealth v. Johnson*, 516 Pa. 407, 415, 532 A.2d 796, 800 (1987), *citing Commonwealth v. Jenkins*, 500 Pa. 144, 149–50, 454 A.2d 1004, 1006–07 (1982) (both setting forth bright line rules concerning station house confessions). The United States Supreme Court, in adopting a bright line rule permitting searches incident to arrest, reasoned that a "police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step of the search." *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973).

This rationale is equally applicable to the present situation. To require a police officer who has independent probable cause to search a vehicle to first consider whether there was sufficient probable cause based on other factors upon which he could have obtained a warrant prior to stopping the car creates uncertainty and confusion for both the police and the citizen who may be subject to the search. In order to deter what some may consider police misconduct and to afford citizens a clear understanding of what the law is, I would urge the adoption of a bright line rule that would allow warrantless searches of all automobiles for which police have independent probable cause to believe: "that a felony has been committed by the occupants of the vehicle, or that it has been used in the furtherance of the commission of a felony, or the officer must have a basis for believing that evidence of a crime is concealed within the vehicle, or that there are weapons therein which are accessible to the occupants." *Commonwealth v. Lewis*, 442 Pa. 98, at 101, 275 A.2d 51, at 52 (1971). Such a bright line rule would prevent police from having to make a Solomon's choice of whether to either try to obtain a warrant and risk flight of the automobile and its occupants, or to not obtain a warrant and risk suppression of the contraband in the automobile.

I must further note that the majority's statement declining to adopt the bright line rule of *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), is unnecessary dicta and as such would not be binding authority. The issue in the present case is whether suppression is required where police failed to obtain a warrant even though they had sufficient probable cause to do so before the search, and *not* the permissible scope of a search once a car is stopped, which is the issue presented in *Belton.* Indeed, neither party even cited *Belton* or addressed the *Belton* issue in their briefs or in oral argument. Because the issue of whether this Commonwealth should adopt *Belton* was therefore not before this Court, any ruling on that issue is merely dicta. *Tulewicz v. SEPTA,* 529 Pa. 588, 594, 606 A.2d 427, 429 (1992) (Court's comments on issue not raised or argued by either party before the Court are dicta). As Mr. Justice Flaherty so aptly stated in *Commonwealth v. Blouse,* while dicta may be instructive in predicting what direction this Court is likely to take on a given issue, it "is not what is meant by precedential authority in our system of jurisprudence." 531 Pa. 167, 176, 611 A.2d 1177, 1182 (1992) (Justice Flaherty, dissenting). Therefore, the majority's assertion that *Belton* does not apply in this Commonwealth does not have the authority of *stare decisis.*

Furthermore, I agree with Mr. Justice Montemuro that in providing Pennsylvania citizens broader protections under the Pennsylvania Constitution than are provided under analogous provisions of the federal constitution, as the majority purports to do, the four-prong test set forth by this Court in *Commonwealth v. Edmunds* should be applied. 526 Pa. 374, 390, 586 A.2d 887, 895 (1991) (setting forth "certain factors to be briefed and analyzed by litigants in each case hereafter implicating a provision of the Pennsylvania Constitution"); *cf. Commonwealth v. Swinehart, Appeal of DeBlase,* 541 Pa. 500, 509 n. 6, 664 A.2d 957, 961 n. 6 (1995) (this Court stated that *Edmunds* analysis is merely "helpful" and therefore litigants' failure to brief four-prong test was not fatal; the Court nonetheless applied the *Edmunds* analysis in determining

whether to provide broader coverage under Pennsylvania Constitution than is provided under federal constitution).